Case No. 12-5581

_____
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
_____

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

### DARREN WESLEY HUFF,

Defendant-Appellant.
_____

### On appeal from the United States District Court
### for the Eastern District of Tennessee
_____

## BRIEF OF THE UNITED STATES
_____

WILLIAM C. KILLIAN
United States Attorney
Eastern District of Tennessee

LUKE A. MCLAURIN
JEFFREY E. THEODORE
Assistant United States Attorneys
800 Market Street, Ste. 211
Knoxville, Tennessee  37902
(865) 545-4167

_____
_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     I.     Defendant's offense conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          A.     Walter Fitzpatrick and the Monroe County grand jury  . . . . . . 2

          B.     Defendant's plan for his own citizens' arrests . . . . . . . . . . . . . 4

          C.     The trip to Madisonville . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     II.     The district court's pretrial rulings . . . . . . . . . . . . . . . . . . . . . . . . . 12

          A.     Motion to suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          B.     Motion to dismiss indictment . . . . . . . . . . . . . . . . . . . . . . . . . 13

     III.     Defendant's sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          A.     PSR Guidelines calculation . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          B.     Objections to the PSR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          C.     The district court's sentencing determination . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.    The district court properly denied Defendant's motion
      to suppress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.   The district court properly concluded that 18 U.S.C.
      § 231(a)(21) is constitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      A.    Section 231(a)(2) was validly enacted pursuant to
            Congress's authority under the Commerce Clause. . . . . . . . . 30

      B.    Section 231(a)(2) is not unconstitutionally overbroad
            in violation of the First Amendment. . . . . . . . . . . . . . . . . . . . 33

      C.    Section 231(a)(2) does not impermissibly infringe
            upon the Second Amendment right to bear arms. . . . . . . . . 37

      D.    Section 231(a)(2) is not impermissibly vague. . . . . . . . . . . . 43

III.  The district court properly concluded that the indictment
      was constitutionally sufficient. . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IV.   The government presented sufficient evidence for any
      rational juror to conclude that Defendant violated
      18 U.S.C. § 213(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

V.    Defendant's below-Guidelines sentence is procedurally
      and substantively reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      A.    The district court properly applied an U.S.S.G.
            § 2K2.1(c) cross-reference to § 2A2.2. . . . . . . . . . . . . . . . . 62

      B.    Defendant has not rebutted the presumption that his
            below-Guidelines sentence is substantively
            reasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

DESIGNATION OF RELEVANT DISTRICT COURT FILINGS . . . . . . . . . . . 69

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                <u>PAGE</u>

*Allen v. United States*, 867 F.2d 969 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 50

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Beck v. Ohio*, 379 U.S. 89 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Brooks v. United States*, 267 U.S. 432 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Cheek v. United States*, 498 U.S. 192 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Commonwealth v. Perez*, 952 N.E.2d 441 (Mass. Ct. App. 2011) . . . . . . . . . . . . 41

*Delaware v. Prouse*, 440 U.S. 648 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*DePierre v. United States*, 131 S. Ct. 2225 (2011) . . . . . . . . . . . . . . . . . . . . . . . . 48

*District of Columbia v. Heller,* 554 U.S. 570 (2008) . . . . . . . . . . 37, 38, 39, 40, 41

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2012) . . . . . . . . . . . . . . 38, 39, 42

*Gall v. United States*, 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 61

*Gorin v. United States*, 312 U.S. 19 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . 43, 46

*Hamling v. United States*, 418 U.S. 87 (1974) . . . . . . . . . . . . . . . . . . . . . . . 49, 51

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) . . . . . . . . . . . 32

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012) . . . . . . . . . . . . . . . 29, 41

*Hill v. Colorado*, 530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) . . . . . . . . . . . . . . 43

*Hoke v. United States*, 227 U.S. 308 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) . . . . . . . . . . 39, 42

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . 37, 40

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 41

*N.A.A.C.P. v. Clairborne Hardware Co.*, 458 U.S. 886 (1982) . . . . . . . . . . . . . . 36

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) . . . . . . . . . . . 30, 31

*National Mobilization Committee to End the War in
    Vietnam v. Foran*, 411 F.2d 934 (7th Cir. 1969) . . . . . . . . . . . . . . . . . . . . 45

*Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco,
    Firearms and Explosives*, 700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . 39, 42

*Puckett v. United States*, 556 U.S. 129 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Southern Ry. Co. v. United States*, 222 U.S. 20 (1911) . . . . . . . . . . . . . . . . . . . . 32

*Texas v. Johnson*, 491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 54

*United States v. Baker*, 197 F.3d 211 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 44

v

*United States v. Brika*, 487 F.3d 450 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Carll*, 105 U.S. 611 (1882) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Chester*, No. 12-4146, 2013 WL 1189253
    (4th Cir. Mar. 25, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Coleman*, 675 F.3d 615 (6th Cir. 2012) . . . . . . . . . . . . . 29, 30, 31

*United States v. Cross*, 677 F.3d 278 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Davis*, 306 F.3d 398 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Evans*, 581 F.3d 333 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Featherston*, 461 F.2d 1119 (5th Cir. 1972) . . . . . . . . . . . . . 32, 45

*United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Freed*, 401 U.S. 601 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) . . . . . . . . . 38, 39, 40, 41, 42

*United States v. Grimes*, 348 F. App'x 138 (6th Cir. 2009) . . . . . . . . . . . . . . . . . 62

*United States v. Henry*, 429 F.3d 603 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Hill*, 386 F.3d 855 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 23

*United States v. Hilliard*, 11 F.3d 618 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Hoffman*, 334 F. Supp. 504 (D.D.C. 1971) . . . . . . . . . . . . . . . . . 33

*United States v. Houston*, 529 F.3d 743 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 60

vi

*United States v. Howard*, 621 F.3d 433 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 23

*United States v. Jackson*, 682 F.3d 448 (6th Cir. 2012) . . . . . . . . . . . . . . . . . 23, 24

*United States v. Leon*, 534 F.2d 667 (6th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . 39

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . 39, 42

*United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971) . . . . . . . . . . 34, 36, 47, 48

*United States v. Newsom*, 452 F.3d 593 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . 54

*United States v. O'Brien*, 391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Overmeyer*, 663 F.3d 862 (6th Cir. 2011) . . . . . . . . . . . . . . . . . 61

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . 39

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) . . . . . . . . . . . . . . . . . . 49

*United States v. Salerno*, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Santos*, 553 U.S. 507 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Sharpnack*, 355 U.S. 286 (1958) . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Simmons*, 587 F.3d 348 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . 61

*United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . 24

*United States v. Smith*, 552 F.2d 257 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . 52-53

*United States v. Stone*, 748 F.2d 361 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . 47

vii

*United States v. Suarez*, 263 F.3d 468 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Trejo-Martinez*, 481 F.3d 409 (6th Cir. 2007) . . . . . . . . . . . . . 65

*United States v. Vincent*, 20 F.3d 229 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 51

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) (*en banc*) . . . . . . . . . . . . 61

*United States v. Vowell*, 516 F.3d 503 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 60

*United States v. Ward*, 506 F.3d 468 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . 35

*United States v. Williams*, 553 U.S. 285 (2008) . . . . . . . . . . . . . . . . . . . . . . . 33, 43

*United States v. Williams*, 545 F.2d 1036 (6th Cir. 1976) . . . . . . . . . . . . . . . . . 52

*United States v. Williams*, 679 F.2d 504 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . 52

*United States v. Wise*, 278 F. App'x 552 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . 58

*United States v. Woodard*, 638 F.3d 506 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . 60

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . 43

## STATUTES, RULES, AND OTHER MATERIALS

18 U.S.C. § 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 232 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 42, 48, 50, 51, 55

18 U.S.C. § 793 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 44, 52

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 2423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 60, 61

Black's Law Dictionary (9th Ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

1 Charles Alan Wright et al, Federal Practice and Procedure
       Section 125 (4th ed. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Federal Rules of Criminal Procedure 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Tenn. Code Ann. § 39-13-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Tenn. Code Ann. § 39-13-102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 46, 63

Tenn. Code Ann. § 39-13-304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 46

Tenn. Code Ann. § 55-8-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Tenn. Code Ann. § 55-8-124 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Tenn. Code Ann. § 55-8-149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 27

U.S.S.G. § 1B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S.S.G. § 2A2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 22, 61, 62, 64

U.S.S.G. § 2A4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S.S.G. § 2K2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 22, 62, 63, 64

U.S.S.G. § 2X1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

U.S.S.G. § 2X5.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 62

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S.S.G. § 5K2.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S.S.G. § 5K2.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States Constitution, Article I, Section 8, Clause 3 . . . . . . . . . . . . . . . . . . . 30

United States Constitution, First Amendment . . . . . . . . . . 29, 33, 34, 36, 37, 40, 48

United States Constitution, Second Amendment . . . . . . . 29, 37, 39, 40, 41, 42, 65

United States Constitution, Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States Constitution, Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . 30, 48

United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . 49

## STATEMENT REGARDING ORAL ARGUMENT

This case involves several constitutional challenges to a federal criminal statute which has never been construed by any court.  As such, oral argument is likely to assist the Court in its decisional process and is hereby requested.

## STATEMENT OF ISSUES

I.    Whether the district court properly denied Defendant's motion to suppress.

II.    Whether the district court properly found that 18 U.S.C. § 231(a)(2) is constitutional.

III.    Whether the district court properly found that the indictment was constitutionally sufficient.

IV.    Whether any rational juror could have found, beyond a reasonable doubt, that Defendant violated 18 U.S.C. § 231(a)(2).

V.    Whether Defendant's below-Guidelines sentence is procedurally and substantively reasonable.

## STATEMENT OF THE CASE

On July 7, 2010, a federal grand jury charged Defendant with (1) transporting a firearm in commerce with the intent that it would be used unlawfully in furtherance of a civil disorder, in violation of 18 U.S.C. § 231(a)(2) (Count One); and (2) carrying a firearm during and in relation to a crime of

1

violence, in violation of 18 U.S.C. § 924(c) (Count Two).  (R. 19, Superseding

Indictment, PageID# 40-41.)  Following a jury trial, Defendant was convicted of

Count One and acquitted of Count Two.  (R. 167, Jury Verdict, PageID# 1054.)

He was subsequently sentenced to a below-Guidelines term of forty-eight months'

imprisonment.  (R. 203, Judgment, PageID# 1325-30.)  This timely appeal

followed.  (R. 204, Notice of Appeal, PageID# 1331.)

## STATEMENT OF FACTS

**I.    Defendant's offense conduct**

    A.    <u>Walter Fitzpatrick and the Monroe County grand jury</u>

In the fall of 2009, Walter Fitzpatrick attempted to present treason and fraud

charges against President Barack Obama to a three-member panel of the grand jury

for Monroe County, Tennessee.[1]  (R. 209, Trial Tr. at PageID# 1397-99.)

Fitzpatrick also asked the panel to bring false prosecution charges against

individuals who had been involved in Fitzpatrick's court-martial from the United

States Navy.  (*Id.*)  The panel determined that the charges were outside the grand

---

[1]Monroe County permits its citizens to appear before a panel of three grand
jurors to recommend pursuing criminal charges.  (R. 209, Trial Tr. at
PageID# 1395-96.)  The panel then decides, based on the evidence presented,
whether to recommend that the full grand jury consider the charges.  (*Id.*)

2

jury's jurisdiction and declined to pass the charges along for consideration by the full grand jury.  (*Id*. at PageID# 1399.)

A couple months later, Fitzpatrick presented the same charges as well as charges against various Monroe County officials to another three-member panel of the grand jury.  (*Id*. at PageID# 1400-02.)  That panel, like the first panel, declined to bring the charges before the full grand jury.  (*Id*.)

Undeterred, Fitzpatrick returned in January 2010 to present his charges to a third grand jury panel.  (*Id*. at PageID# 1403.)  This time, he alleged criminal violations by all personnel of the Monroe County criminal court system, including Gary Pettway who was the foreman of the grand jury and a member of the first grand jury panel.  (*Id*.)  When that panel also recommended against presenting the charges to the full grand jury, Fitzpatrick became upset and had to be removed from the courthouse by the local police officers.  (*Id*. at PageID# 1404.)

On April 1, 2010, Fitzpatrick, accompanied by Defendant—a resident of Dallas, Georgia—returned to the Monroe County courthouse in Madisonville, Tennessee, with a "Citizens' Arrest Warrant" for President Obama, Pettway, and twenty-two other federal, state, and local officials.  (*Id*. at PageID# 1404-06, 1501;

*see also* R. 140-1, Citizens' Arrest Warrant at PageID# 969.[2])  Fitzpatrick

confronted Pettway in the courtroom where the grand jury was convening and

attempted to place Pettway under arrest, while Defendant filmed the incident.

(R. 209, Trial Tr. at PageID# 1407-11, 1418-19.)

Law enforcement officers immediately responded to the scene, removed

Fitzpatrick and Defendant from the courtroom, and arrested Fitzpatrick for

disruption of a meeting and disorderly conduct.  (*Id*. at PageID# 1412, 1432.)

Prior to being arrested, Fitzpatrick attempted to arrest Monroe County Sheriff Bill

Bivens pursuant to the same "Citizens' Arrest Warrant."  (*Id*. at PageID# 1427-31.)

## B.    Defendant's plan for his own citizens' arrests

Following Fitzpatrick's arrest, Defendant began planning citizens' arrests of

Madisonville officials involved in Fitzpatrick's case.  On April 7, 2010, Defendant

returned to Madisonville to meet Fitzpatrick, who had just been released on bond

and was awaiting a court hearing scheduled for April 20, 2010.  (R. 210, Trial Tr.

at PageID# 1688-91; R. 211, Trial Tr. at PageID# 1795; R. 212, Trial Tr. at

---

[2]The "Citizens' Arrest Warrant" was admitted as Government Trial
Exhibit 2.  (R. 168, Trial Exhibit and Witness List at PageID# 1055.)  While that
exhibit is not electronically available, an accurate copy of the document was filed
as an attachment to one of the government's pretrial filings.  (R. 140-1, Citizens'
Arrest Warrant at PageID# 969.)

4

PageID# 1910.)  Following that meeting, Defendant informed a friend via text message that no citizens' arrests had been conducted that day.  (R. 210, Trial Tr. at PageID# 1690.)  When the friend asked if Defendant had "pull[ed] out the mussell [*sic*]" (*id.*), which was a reference to "some type of force" (R. 211, Trial Tr. at 1799), Defendant replied that he had not because Fitzpatrick had been released the night before (R. 210, Trial Tr. at PageID# 1690).  Defendant explained, however, that it had not been a "wasted trip" because he had "met with the arrested to coordinate with all groups involved."  (*Id.* at PageID# 1690-91.)  Defendant also stated, "we're moving on to Phase 2."  (*Id.* at PageID# 1690.)

Defendant gave hints about that second phase to two employees at the J.P. Morgan Chase Bank in Hiram, Georgia, on April 15, 2010.  That day, Shane Longmire was working as the bank manager and Erica Dupree was one of the tellers.  (R. 209, Trial Tr. at PageID# 1445, 1447, 1470.)  Both individuals were familiar with Defendant because he had been a regular customer of the bank since 2005 and had recently expressed anti-government sentiment.  (*Id.* at PageID# 1445-46; R. 210, Trial Tr. at PageID# 1470-71.)

That morning, however, Defendant made comments that were "out of the ordinary."  (*Id.* at PageID# 1452.)  Defendant told Longmire and Dupree that, on April 20, 2010, he was going to Madisonville with members of the Georgia Militia

to "take over" the city.  (*Id*. at PageID# 1447-49, 1454; R. 210, Trial Tr. at 1471-74, 1485-86.)  He explained that they were going there because Fitzpatrick had been "wrongly arrested."  (R. 209, Trial Tr. at PageID# 1448.)  Defendant stated he was going to bring multiple guns, including an AK-47 rifle, and that he would be on the "front line."  (*Id*. at PageID# 1449; *accord* R. 210, Trial Tr. at PageID# 1471-73.)  He also said that he would have an anti-aircraft gun mounted on the back of his truck.  (R. 209, Trial Tr. at PageID# 1450, 1456; R. 210, Trial Tr. at PageID# 1473, 1480-82.)  Defendant assured Longmire and Dupree that they would hear about the incident on the news.  (R. 209, Trial Tr. at PageID# 1449; R. 210, Trial Tr. at PageID# 1472.)

As Defendant was speaking, Longmire noticed that Defendant had driven a different truck to the bank than the one he normally drove.  (R. 209, Trial Tr. at PageID# 1451-52.)  The new truck was painted camouflage and had a "Georgia Militia" emblem on the door.  (*Id*. at PageID# 1452, 1456.)  When Defendant left the bank, he told Dupree that it had been nice knowing her and suggested that he might not ever see her again.  (R. 210, Trial Tr. at PageID# 1475.)  Longmire and Dupree both believed that Defendant was serious and were so concerned by his statements that they each separately contacted law enforcement authorities.

6

(R. 209, Trial Tr. at PageID# 1452-53; R. 210, Trial Tr. at PageID# 1472, 1475-78.)

To follow up on those reports, Federal Bureau of Investigation (FBI) Special Agent Charles Reed spoke with Defendant at his residence on April 19, 2010. (R. 210, Trial Tr. at PageID# 1670-72.)  Defendant confirmed that he was planning to go Madisonville the next day.  (*Id*. at PageID# 1672.)  Defendant explained that he intended to conduct some citizens' arrests there.  (*Id*. at PageID# 1678.)  He said that he and other militia members would "try to take back" Madisonville and Monroe County and "possibly" even Tennessee and the United States.  (*Id*. at PageID# 1672.)  Defendant described the situation as "us against them," with the "them" being government officials in Madisonville.  (*Id*.)

Defendant also confirmed that he would be armed with his Colt .45 caliber handgun and would have an AK-47 rifle.  (*Id*.)  However, he explained that "they would not resort to violence unless they were provoked."  (*Id*. at PageID# 1673.)  Defendant told Special Agent Reed that he was "happy" that the agent had come, gave the agent his business card, and told the agent to call him if there was a problem.  (*Id*. at PageID# 1683-84.)

7

C.    <u>The trip to Madisonville</u>

The next day, April 20, 2010, Defendant was observed by the FBI leaving

his residence in Georgia and crossing into Tennessee, accompanied by Michael

Desilva.  (*Id*. at PageID# 1687; R. 212, Trial Tr. at PageID# 1852-53.)  In the

vehicle, Defendant had a Colt .45 caliber handgun and an AK-47 rifle with

approximately three hundred rounds of ammunition.  (R. 210, Trial Tr.

at PageID# 1555, 1607, 1612, 1691-92; R. 212, Trial Tr. at 1903, 1914, 1916.)

Several miles outside of Madisonville, State Trooper Michael Wilson

observed Defendant commit two traffic violations as his pickup truck exited the

interstate.  (R. 210, Trial Tr. at PageID# 1491-92.)  Trooper Wilson pulled over

Defendant's vehicle and ultimately issued two warning citations.  (*Id*. at

PageID# 1495, 1504.)

During that traffic stop, officers saw Defendant wearing a Colt .45 caliber

handgun.  (*Id*. at PageID# 1496-97.)  Defendant "forewarn[ed]" the officers that he

was meeting militia members in Madisonville and that "if enough people

… show[ed] up [they] fully intend[ed] to proceed forward with … citizens

arrests."  (Gov't Trial Ex. 9;[3] *accord* R. 210, at PageID# 1504-09, 1558; R. 211,

---

[3]Government Trial Exhibit 9 is a video clip of Defendant during the traffic
stop.  (R. 168, Trial Exhibit and Witness List at PageID# 1056.)  Copies of that
DVD have been provided to the Court.

Trial Tr. at PageID# 1924, 1942.)  Defendant said "that was the reason why [he had his] .45, because ain't no government official gonna go peacefully."  (Gov't Trial Ex. 9; *accord* R. 210, Trial Tr. at PageID# 1504-05.)

Defendant also informed the officers that he had an AK-47 in the toolbox of his truck.  (R. 210, Trial Tr. at PageID# 1555; R. 211, Trial Tr. at PageID# 1856). He explained that he and the militia members were going to take over the Monroe County courthouse and that he was personally going to use his AK-47 rifle to conduct arrests inside the courthouse.  (R. 210, Trial Tr. at 1532-33, 1553-55, 1571, 1574-78.)  Defendant assured the officers that he was "ready to die for his cause."  (*Id*. at PageID# 1557, 1578).  He told them, "If it comes to that I've got to fight you guys, I have no choice."  (Gov't Trial Ex. 40;[4] *accord* R. 210, Trial Tr. at PageID# 1559-62.)

In addition to the firearms, Defendant had multiple copies of two documents, respectively titled "Citizens' Arrest Warrant" and "Affidavit of Criminal Complaint."  (R. 210, Trial Tr. at PageID# 1505-07, 1554-54.)  The first document was identical to the "Citizens' Arrest Warrant" used by Fitzpatrick on April 1, 2010.  (*Id*.)  Both documents were signed by Fitzpatrick and listed

---

[4]Government Trial Exhibit 40 is another video clip of Defendant during the traffic stop.  (R. 168, Trial Exhibit and Witness List at PageID# 1056.)  Copies of that DVD have been provided to the Court.

President Obama and numerous other public officials as "declared domestic enemies" who had committed treason. (R. 140-1, Citizens' Arrest Warrant at PageID# 969; R. 140-2, Affidavit of Criminal Complaint at PageID# 970.) Other militia groups headed toward Madisonville that day had the same documents. (R. 210, Trial Tr. at PageID# 1554-55.)

At the end of the traffic stop, officers asked Defendant if he would place his Colt .45 caliber handgun in the toolbox of his truck. (R. 210, Trial Tr. at PageID# 1563; R. 211, Trial Tr. at PageID# 1858.) Defendant complied with that request and proceeded to Madisonville, where nearly one hundred local, state, and federal law enforcement officers had already assembled in response to Defendant's earlier statements. (R. 210, Trial Tr. at PageID# 1563, 1602; R. 212, Trial Tr. at PageID# 1968.)

When Defendant arrived, he met with a group of approximately twenty individuals at a restaurant directly across the street from the courthouse. (R. 210, Trial Tr. at PageID# 1566-70.) Some of the individuals had firearms at their side. (*Id*.) Members of the group also frequently pointed to the courthouse, walked around it in teams, and took photographs of it. (*Id*.) At least six of the individuals who walked around the courthouse had firearms. (*Id*. at PageID# 1617.) Law enforcement officers who were present believed that the situation was very tense

10

and could have escalated. (*Id*. at PageID# 1573-75, 1610; R. 212, Trial Tr. at PageID# 1967.)

Defendant went to his truck several times while in Madisonville. (R. 210, Trial Tr. at 1582-83.) On one occasion, he took what appeared to be a Colt .45 caliber handgun from the toolbox. (*Id*. at PageID# 1572, 1582-83, 1605.) Defendant then tried to rally his group with a motivational speech. (*Id*. at PageID# 1607-08.) During the speech, he mentioned that he had an AK-47 rifle and three to four hundred rounds of ammunition in his truck. (*Id*.) Afterwards, he said that it would be "a good day to take over the courthouse" but wished that they had more people. (*Id*.) Defendant eventually left Madisonville and drove back to Georgia. (R. 211, Trial Tr. at PageID# 1824.)

Ten days later, Defendant was arrested pursuant to a federal warrant while driving a camouflage-painted truck through Knoxville, Tennessee. (R. 210, Trial Tr. at PageID# 1626-27.) Agents seized from the truck a Kel-Tec .40 caliber rifle, over 700 rounds of AK-47 ammunition with ammunition clips, a gas mask, and multiple copies of the "Citizens' Arrest Warrant." (*Id*. at PageID # 1634, 1637, 1641-43, 1649.) That same day, FBI agents executed a search warrant at Defendant's residence and seized an AK-47 rifle and approximately 400 to 500 rounds of ammunition. (*Id*. at PageID # 1663-64, 1666-69.)

11

At trial, Defendant denied being with Fitzpatrick when he attempted to arrest Pettway on April 1, 2010 (R. 212, Trial Tr. at PageID# 1899) and denied retrieving his Colt .45 caliber handgun from his truck while in Madisonville on April 20, 2010 (*id*. at PageID# 1934).  Defendant also denied telling Longmire and Dupree that he was going to take over Madisonville (*id*. at PageID# 1911, 1915, 1932-33), that he would be on the front line with his AK-47 rifle (*id*. at PageID# 1922), and that he would mount an anti-aircraft gun on his vehicle (*id*. at PageID# 1913). Defendant admitted, however, that he had previously possessed such a gun and had a mount for it.  (*Id*. at PageID# 1913.)  He also admitted that he occasionally referred to himself as a "potential domestic terrorist" (*id*. at PageID# 1894) and that he had previously stated that he wanted to arrest government officials in Madisonville for the capital offense of treason (*id.* at PageID# 1925-28).

## II.    The district court's pretrial rulings

### A.    Motion to suppress

Prior to trial, Defendant filed a motion to suppress evidence obtained during the traffic stop outside of Madisonville on April 20, 2010.  (R. 22, Motion to Suppress at PageID# 47-50.)  After conducting a hearing on the matter, the district

court denied the motion.  (R. 62, Report and Recommendation at PageID# 446-63; R. 84, Memorandum and Order at PageID# 673-88.)

The court concluded that Trooper Wilson had probable cause to pull over Defendant for following too closely and failing to stop at a stop sign.  (R. 62, Report and Recommendation at PageID# 462.)  The district court based that conclusion on Trooper Wilson's testimony that Defendant had left less than one car length of space between his vehicle and the car in front, nearly hit that car when it stopped at the stop sign, and then made a brief rolling stop after he was past the stop line at the intersection.  (*Id*. at PageID# 455-62 (citing relevant portions from suppression transcript).)  The court found Trooper Wilson credible and concluded that his account was corroborated by a video of the incident.  (*Id*.)

B.    Motions to dismiss indictment

Defendant also sought to have the indictment dismissed on multiple grounds.  Defendant alleged that 18 U.S.C. § 231(a)(2) exceeded Congress's authority under the Commerce Clause (R. 29, Motion to Dismiss for Failure to Establish Commerce Clause Jurisdiction at PageID# 67-81) and was unconstitutionally vague and overbroad (R. 33, Motion to Dismiss Based on Overbreadth and Vagueness at PageID# 129-42).  Defendant also claimed that the indictment failed to fully inform him of the charges against him (R. 32, Motion to

13

Dismiss Insufficient Indictment at PageID# 118-27) and sought a bill of particulars
(R. 23, Motion for Bill of Particulars at PageID# 52-56; R. 35, Second Motion for
a Bill of Particulars at PageID# 155-56).

After considering extensive briefing on those issues, the district court
rejected each of those challenges to the indictment.  (R. 64, Report and
Recommendation at PageID# 470-79 (Commerce Clause); R. 68, Report and
Recommendation at PageID# 510-24 (Overbreadth and Vagueness); R. 76, Report
and Recommendation at PageID# 609-43 (Sufficiency of Indictment); R. 80,
Memorandum and Order at PageID# 649-56 (Commerce Clause); R. 83,
Memorandum and Order at PageID# 662-72 (Overbreadth and Vagueness); R. 101,
Memorandum and Order at PageID# 800-10 (Sufficiency of Indictment).)  The
court partially granted Defendant's request for bill of particulars (R. 106,
Memorandum and Order at PageID# 828-36) and the United States provided the
requested information (R. 114, Bill of Particulars at PageID# 854-55).

**III.    Defendant's sentence**

    A.    <u>PSR Guidelines calculation</u>

Because the Sentencing Commission has not expressly promulgated any
guideline for the offense listed in 18 U.S.C. § 231(a)(2), the probation officer used
the instructions in U.S.S.G. §§ 1B1.2(a) and 2X5.1 to determine the most

14

analogous offense guideline. (Presentence Investigation Report ("PSR") at ¶ 17, Confidential Document.) He concluded that § 2K2.1—which is used for offenses involving the unlawful transportation of firearms—was the most analogous offense guideline, and, pursuant to § 2K2.1(a)(7), calculated a base offense level of 12. (*Id.* at ¶ 18.) He then applied a six-level enhancement, pursuant to § 2K2.1(b)(6)(B), because Defendant possessed a firearm with the intent to use it in connection with another felony offense. (*Id.* at ¶ 19.) Turning to § 2K2.1(c), the probation officer determined that a cross-reference to § 2A2.2—the aggravated assault guideline—was appropriate because Defendant transported a firearm with the intent that it be used in connection with an aggravated assault. (*Id.* at ¶ 20.)

Under § 2A2.2(a)(1), Defendant's base offense level was 14. (*Id.*) The probation officer then applied (1) a two-level § 2A2.2(b)(1) enhancement because Defendant's offense involved more than minimal planning (*id.* at ¶ 21); (2) a three-level § 2A2.2(b)(2)(C) enhancement because Defendant brandished a firearm and threatened its use (*id.* at ¶ 22); (3) a six-level § 3A1.2(b) enhancement because Defendant's intended victims were government officials (*id.* at ¶ 23); and (4) a two-level § 3C1.1 enhancement because Defendant committed perjury at his trial (*id.* at ¶ 24). Those enhancements resulted in a total offense level of 27, which, combined with Defendant's criminal history category of I, yielded an

15

advisory Guidelines range of 70 to 87 months' imprisonment. (*Id.* at ¶ 49.)

However, because 18 U.S.C. § 231(a)(2) authorizes a maximum sentence of five

years' imprisonment, Defendant's restricted Guideline range was 60 months'

imprisonment. (*Id.* at ¶¶ 48-49.)

      B.    Objections to the PSR

    Among other things, Defendant objected to the application of (1) the six-

level § 2K2.1(b)(6)(B) enhancement; (2) the cross-reference to the § 2A2.2

aggravated assault guideline; (3) the three-level § 2A2.2(b)(2)(C) enhancement;

and (4) the two-level § 3C1.1 obstruction-of-justice enhancement. (PSR

Addendum, Confidential Document.) Defendant did not object to the use of

§ 2K2.1 as the most analogous offense guideline for 18 U.S.C. § 231(a)(2).

    The United States contested the probation officer's use of § 2K2.1,

contending that § 2A4.1—the kidnapping guideline—more appropriately captured

the extent of Defendant's offense. (R. 191, Memorandum Regarding Application

of Guidelines at PageID# 1217-21.) In the alternative, the United States argued

that, were § 2K2.1 applied, the cross-reference under § 2K2.1(c) should refer to the

kidnapping guideline, *i.e.*, § 2A4.1. (*Id.*) The United States further requested a

four-level leadership role enhancement pursuant to § 3B1.1(a). (*Id.*) Finally, the

United States filed a motion for an upward departure pursuant to §§ 5K2.7 and

16

5K2.17 (R. 192, Motion for Upward Departure at PageID# 1230-33), which was

ultimately deemed moot (R. 216, Sentencing Tr. at PageID# 2198-99).

C.    The district court's sentencing determination

After conducting an extensive hearing (R. 213, Sentencing Tr. at

PageID# 1999-2053), the district court overruled both parties' objections and

concluded that the PSR accurately calculated the advisory Guidelines range.

(R. 197, Memorandum Opinion and Order at PageID# 1248-70.)  Among other

things, the court found that the United States's objection concerning the most

analogous offense guideline under § 2X5.1 was moot because a cross-reference to

another offense guideline was permitted under § 2K2.1(c).  (*Id*. at PageID# 1251.)

Turning to that cross-reference, the court concluded that Defendant's

possession of firearms had the potential of facilitating another offense.  (*Id*. at

PageID# 1258.)  The court found the evidence insufficient to demonstrate that

Defendant was going to falsely imprison Madisonville officials and thereby

commit aggravated kidnapping, as defined in Tenn. Code. Ann. § 39-13-304.  (*Id*.

at PageID# 1260.)  However, the court found that the evidence demonstrated that

"had the defendant been able to carry out the plan to execute the citizens' arrest

warrant … he would have either caused others to reasonably fear imminent bodily

injury or caused physical contact that a reasonable person would have found

17

extremely offensive or provocative." (*Id*. at PageID# 1260-61.) Accordingly, the court concluded that Defendant possessed firearms in connection with the offense of aggravated assault as defined by Tenn. Code. Ann. § 39-13-102, and thereby determined that a cross-reference to § 2A2.2 was appropriate. (*Id*. at PageID# 1261.)

After concluding that the PSR accurately calculated Defendant's advisory Guidelines range, the district court conducted a separate hearing to select an appropriate sentence in light of the 18 U.S.C. § 3553(a) factors. (R. 216, Sentencing Tr. at PageID# 2106-2208.) Defendant contended that a below-Guidelines sentence of time served was appropriate because (1) his offense conduct was allegedly not very serious and only involved "thinking bad thoughts while driving around (legally) with guns" (R. 189, Sentencing Memorandum at 6);[5] (2) he was allegedly less culpable than other individuals, such as Fitzpatrick (*id*. at 10-11); (3) he was allegedly vulnerable to abuse in prison based on media reports describing him as a "white supremacist" (*id*. at 8-10); (4) he was subject to extra-judicial punishments such as the loss of his right to carry a firearm (*id*. at 11-

---

[5]While Defendant's sentencing memorandum is electronically available in the district court record, it was initially filed under seal and does not contain PageID#s. Accordingly, all references to it use the pagination in the document itself.

18

12); (5) a statutory maximum sentence would allegedly undermine respect for the law (*id*. at 12-14); (6) his Guideline range was allegedly disproportionate when compared to other high-profile defendants who had recently been prosecuted in the Eastern District of Tennessee (R. 216, Sentencing Tr. at PageID# 2154-56); and (7) he was allegedly not the "worst of the worst" violators of 18 U.S.C. § 231(a)(2) (*id*. at PageID# 2154).

After considering the United States's response to those arguments (*id*. at PageID# 2157-72) and Defendant's personal allocution (*id*. at PageID# 2173-78) and conducting its own evaluation of the 18 U.S.C. § 3553(a) factors (*id*. at PageID# 2179-90), the district court imposed a below-Guidelines sentence of forty-eight months' imprisonment (*id*. at PageID# 2201). Although the court imposed a below-Guidelines sentence, it explicitly rejected each one of Defendant's arguments for a downward variance. (*Id*. at PageID# 2190-97.) With respect to the disparity arguments, the court found that the sentences imposed on Fitzpatrick and the other defendants referenced by Defendant were not relevant because each of those individuals had engaged in different conduct than Defendant and were charged with different offenses. (*Id*. at PageID# 2190-93.) The court also found that the extra-judicial consequences of Defendant's conviction—such as loss of firearm privileges—and Defendant's alleged

19

susceptibility to abuse in prison were no different than what many defendants who espouse certain political views experience and, thus, did not warrant a variance. (*Id*. at PageID# 2193-94.)  Finally, the court disagreed with Defendant's minimization of the seriousness of his offense and rejected his contention that a within-Guidelines sentence would encourage disrespect for the law.  (*Id*. at PageID# 2194-97.)

The court then emphasized the "serious" nature of Defendant's offense, which, in the court's estimation, was a crime of violence.  (*Id*. at PageID# 2200.) The court also noted that Defendant did not have a lengthy criminal history.  (*Id*.) Based on its analysis of all the § 3553(a) factors, the court concluded that a below-Guidelines sentence of forty-eight months' imprisonment was sufficient, but no greater than necessary.  (*Id*. at PageID# 2201.)

## SUMMARY OF ARGUMENT

I.      The district court properly denied Defendant's motion to suppress upon finding that Trooper Wilson had probable cause to stop Defendant for committing two traffic violations.  Trooper Wilson testified that he observed Defendant follow another vehicle too closely and fail to fully stop at a stop sign before entering the intersection.  Video evidence corroborated that testimony.  Accordingly, the district court did not clearly err in crediting Trooper Wilson's testimony and concluding that he had probable cause to stop Defendant for two traffic violations.

II.     The district court also properly concluded that 18 U.S.C. § 231(a)(2) is constitutional.  That statute directly regulates things traveling in interstate commerce, does not regulate speech, and does not infringe upon the right to possess a firearm for self-defense.  Moreover, the statute is not vague, but rather identifies with precision the conduct it prohibits using common, everyday language.

III.    The district court properly concluded that the indictment in this case was sufficient to inform Defendant of the nature of the charges against him and protect him from subsequent prosecution for the same offense.  The information which Defendant alleges the indictment should have contained was not constitutionally required.

21

IV.    The government presented sufficient evidence for any rational juror to convict Defendant of violating 18 U.S.C. § 231(a)(2).  Defendant does not dispute that he transported firearms in commerce and Defendant's own statements to numerous witnesses clearly demonstrate his intent to use those firearms in furtherance of a public disturbance that would have involved acts of violence and created an immediate danger to the Madisonville community.

V.    Defendant's below-Guidelines sentence is procedurally and substantively reasonable.  The district court properly determined that U.S.S.G. § 2K2.1 was the most analogous offense guideline for Defendant's violation of 18 U.S.C. § 231(a)(2) and properly applied a cross-reference to § 2A2.2 to calculate an advisory Guidelines range of sixty months' imprisonment.  The district court then properly exercised its discretion in rejecting Defendant's specific variance arguments and concluding that a below-Guidelines sentence of forty-eight months was appropriate.

## ARGUMENT

## I.    The district court properly denied Defendant's motion to suppress.

In evaluating the denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its conclusions of law *de novo*. *United States v. Jackson*, 682 F.3d 448, 452 (6th Cir. 2012).  "Whether a seizure is reasonable under the Fourth Amendment is a question of law that [the Court] review[s] *de novo*."  *United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009). Credibility determinations, however, are afforded great deference, and, when the district court has denied the motion, the Court must "consider the evidence in the light most favorable to the government."  *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010).  The Court may uphold the denial of a motion to suppress on any ground supported by the record.  *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Stopping a vehicle and temporarily detaining its occupants constitutes a seizure under the Fourth Amendment.  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  Such seizures are reasonable, and thus permissible, however, when police officers either have "probable cause to believe

23

that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).[6]  Probable cause exists when "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct.  *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993).

Here, the district court properly concluded that Trooper Wilson had probable cause to believe that Defendant had committed two traffic violations: (1) following too closely, in violation of. Tenn. Code Ann. § 55-8-124; and (2) failing to stop at a stop sign, in violation of Tenn. Code Ann. § 55-8-149(c). (R. 62, Report and Recommendation at PageID# 457-62.)  The first of those statutes provides that "[t]he driver of a motor vehicle shall not follow another

---

[6] The United States maintains that the proper legal standard governing all vehicle stops, including those initiated only for traffic violations, should be reasonable suspicion.  *See*, *e.g.*, *United States v. Simpson*, 520 F.3d 531, 540-41 (6th Cir. 2008) (noting that "virtually every other circuit has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation" and suggesting that the Sixth Circuit do likewise).  Nevertheless, the Court need not revisit that issue in this case because, as explained above, Trooper Wilson had probable cause to believe that a traffic violation had been committed.

24

vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon the condition of the highway." Tenn. Code Ann. § 55-8-124(a). The statute offers the following guidance as to what constitutes following too closely, at least with regard to vehicles traveling in a caravan:

> Motor vehicles being driven upon any roadway outside of a business or residence district in a caravan or motorcade, whether or not towing other vehicles, shall be so operated as to allow sufficient space between each vehicle of combination of vehicles so as to enable any other vehicle to enter and occupy the space without danger.

Tenn. Code Ann. § 55-8-124(c).

At the suppression hearing, Trooper Wilson testified that he observed Defendant's truck driving on the exit ramp "less than one car length" behind vehicle in front of him. (R. 55, Suppression Tr. at PageID# 292.) Trooper Wilson then observed Defendant apply his brakes "suddenly" at the end of the exit ramp and nearly hit the vehicle in front of him. (*Id*. at PageID# 283; *accord id*. at PageID# 293, 335-336, 339.) Based on those facts, the district court properly concluded that Trooper Wilson had reason to believe that Defendant's vehicle was following too closely in violation of Tenn. Code Ann. § 55-8-124.

Defendant contends that Desilva's testimony at the suppression hearing demonstrated that Defendant was not following too closely. (Def. Br. at 37-38.)

However, Desilva did not necessarily contradict Trooper Wilson's account. Desilva, the passenger in Defendant's vehicle, simply testified that he did not "feel" that Defendant's truck was going to collide with the car in front of them. (R. 55, Suppression Tr. at PageID# 380.)  For Desilva, the incident did not "stand out" and he could not "remember anything about the car in front of" Defendant's vehicle.  (*Id*.)

In any event, the district court extensively reviewed the video of the incident and found that "it corroborate[d] Trooper's Wilson's testimony."  (R. 62, Report and Recommendation at PageID# 458.)  Accordingly, the district court properly credited that testimony and reasonably concluded that the trooper had reason to believe that Defendant's vehicle was following too closely.  *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

The district court also accurately concluded that Trooper Wilson had probable cause to believe that Defendant violated Tenn. Code Ann. § 55-8-149(c). That statute provides:

> Every driver of a vehicle and every operator of a streetcar
> approaching a stop sign shall stop before entering the crosswalk on
> the near side of the intersection, or in the event there is no crosswalk,

26

shall stop at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver or operator has a view of approaching traffic on the intersecting roadway before entering the intersection, except when directed to proceed by a police officer or traffic control signal.

Tenn. Code Ann. § 55-8-149(c).  The definition of "stop" in this context is provided by Tenn. Code Ann. § 55-8-101(61):  "'Stop,' when required, means complete cessation from movement."

Trooper Wilson testified that he observed Defendant's truck make "a very brief rolling stop" after it was "past the stop line" at the intersection of the exit ramp and Highway 68.  (R. 55, Suppression Tr. at PageID# 283; *accord id*. at PageID# 294.)  Trooper Wilson acknowledged that Defendant's vehicle paused for "less than one second,"  but noted that the vehicle was past the stop line at that point.  (*Id*. at PageID# 342.)  In Trooper Wilson's view that was not a "true," "controlled," "legal," or "safe" stop.  (*Id*. at PageID# 341-343.)

After carefully analyzing the video of the incident, the district court found that it corroborated Trooper Wilson's testimony that Defendant's vehicle had paused for less than a second.  (R. 62, Report and Recommendation at PageID# 459 ("[T]he video shows that the Defendant applied his brakes and paused briefly at 7:09:17 but was moving into the intersection by 7:09:18."); *see*

27

*also* Gov't Suppression Ex. 3.[7])  The video also confirmed that Defendant's vehicle

was already "in the intersection" at the time that it "paused for less than one

second."  (R. 62, Report and Recommendation at PageID# 459.)  While the court

was unable to see the stop line in the video, the court found Trooper Wilson's

testimony credible and noted that "he was in a much better position to determine

where the Defendant was in relation to the intersection and the stop sign when he

made the 'rolling stop.'" (*Id*. at PageID# 460.)

Based on those factual findings, the district court properly concluded that

Trooper Wilson had reason to believe that Defendant had failed to stop his vehicle

in the manner required by Tennessee law.  While Defendant claims that those

factual findings were clearly erroneous, he offers nothing—other than his own bald

assertions—to contradict them.  (Def. Br. at 38.)  The video which the district court

extensively reviewed and cited supports its factual conclusions.  (*See generally*

Gov't Suppression Ex. 3.)

In sum, the district court properly concluded, based on the testimony and

video evidence presented at the suppression hearing, that Trooper Wilson had

probable cause to believe that Defendant had committed two traffic violations.

---

[7]Government Suppression Exhibit 3 is a video of the traffic stop which was taken from Trooper Wilson's cruiser.  (R. 48, Suppression Exhibit and Witness List at PageID# 231.)  Copies of that DVD have been provided to the Court.

Accordingly, the district court properly found that the stop of Defendant's vehicle was reasonable and denied Defendant's motion to suppress.

## II.    The district court properly concluded that 18 U.S.C. § 231(a)(2) is constitutional.

This Court reviews a district court's determination of the constitutionality of a statute *de novo*. *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012). Defendant contends that 18 U.S.C. § 231(a)(2) is unconstitutional for several reasons. First, Defendant claims that the statute exceeds Congress's authority under the Commerce Clause. (Def. Br. at 39-42.) Next, Defendant asserts that the statute is facially overbroad and infringes upon rights protected by both the First Amendment and Second Amendment.[8] (*Id*. at 43-44.) Finally, Defendant alleges

---

[8]Defendant contends that 18 U.S.C. § 231(a)(2) is "overbroad" because it "implicate[s] the rights of speech and association under the First Amendment" as well as the "right to possess firearms" under the "Second Amendment." (Def. Br. at 44.) However, "overbreadth" is an exclusively First Amendment doctrine which has never been applied to analyze statutory challenges based on the Second Amendment. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."); *United States v. Chester*, No. 12-4146, 2013 WL 1189253, at *2 (4th Cir. Mar. 25, 2013) ("[N]o circuit has accepted an overbreadth challenge in the Second Amendment context."); *Hightower v. City of Boston*, 693 F.3d 61, 82-83 (1st Cir. 2012) (expressly rejecting the possibility of a Second Amendment overbreadth argument and noting that every court which has considered the issue has done so as well). Because a different standard of review applies to Second Amendment challenges, the United States has addressed Defendant's First and Second Amendment arguments separately.

that the statute is impermissibly vague, in violation of the Due Process Clause of the Fifth Amendment. (*Id.* at 45-46.) None of those arguments have merit.

    A.    <u>Section 231(a)(2) was validly enacted pursuant to Congress's authority under the Commerce Clause.</u>

Clause 3 of Article I, Section 8 of the Constitution (also known as the "Commerce Clause") grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I § 8, cl. 3. Under that power, Congress may regulate three broad categories of activity:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted); *accord Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 132 S. Ct. 2566, 2578 (2012). This Court may invalidate a statute "only if [it] bear[s] no rational relationship to any of these powers." *Coleman*, 675 F.3d at 619.

The statute at issue here—18 U.S.C. § 231(a)(2)—fits comfortably within the first two broad categories of Congress's Commerce Clause power. First, the

statute directly regulates the channels of interstate commerce by prohibiting, under

certain circumstances, the "transport[ation] … in commerce [of] any firearm."  18

U.S.C. § 231(a)(2).  Defendant attempts to avoid that obvious conclusion by

arguing that the transport of firearms is not a commercial activity.  (Def. Br. at 41.)

However, it is well established that "[t]he 'commerce' that Congress may regulate

through the first *Lopez* prong is not limited to economic matters, but rather may

encompass 'using the channels of interstate commerce to bring the spread of any

evil or harm to the people of other states from the state of origin.'" *Coleman*, 675

F.3d at 620 (quoting *Brooks v. United States*, 267 U.S. 432, 436 (1925)).  Indeed,

18 U.S.C. § 922(g), which prohibits certain individuals from, among other things,

"transport[ing] in interstate or foreign commerce … any firearm or ammunition,"

has consistently been upheld as valid under the Commerce Clause.  *See*, *e.g.*,

*United States v. Henry*, 429 F.3d 603, 619 n.20 (6th Cir. 2005) (citing the Court's

"numerous precedents" rejecting Commerce Clause challenges to 18 U.S.C.

§ 922(g)).

Section 231(a)(2) is also valid as a regulation of the instrumentalities of

interstate commerce which includes "persons or things in interstate commerce."

*NFIB*, 132 S. Ct. at 2578.  The firearms whose transport § 231(a)(2) regulates are

things which, by statutory definition, are "in commerce."[9] 18 U.S.C. § 231(a)(2).

Thus, under the Commerce Clause, Congress has the ability to regulate the manner

and conditions of their transport.  *See*, *e.g.*, *Southern Ry. Co. v. United States*, 222

U.S. 20, 27 (1911) (Congress's "power to regulate interstate commerce is plenary,

and competently may be extended to secure the safety of the persons and property

transported therein.").

In sum, 18 U.S.C. § 231(a)(2) regulates both the channels and

instrumentalities of interstate commerce.  Accordingly, the Court should find that

that subsection of § 231(a), like the statute's other subsections, was validly enacted

pursuant to Congress's Commerce Clause authority.  *See United States v.*

*Featherston*, 461 F.2d 1119, 1123 (5th Cir. 1972) ("The argument that Congress

exceeded its power under the Commerce Clause in enacting § 231(a)(1) fails to

rise to the level of a substantial constitutional question and is rejected."); *United*

---

[9]For purposes of 18 U.S.C. § 231(a)(2), federal law defines "commerce" as "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia."  18 U.S.C. § 232(2).  That definition encompasses the "commerce" which Congress may regulate under the Commerce Clause.  *See*, *e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) ("Commerce among the states, we have said, consists of intercourse and traffic between their citizens, and includes the transportation of persons and property." (quoting *Hoke v. United States*, 227 U.S. 308, 320 (1913))).

*States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. 1971) (summarily rejecting

Commerce Clause challenge to 18 U.S.C. § 231(a)(3)).

> B.     Section 231(a)(2) is not unconstitutionally overbroad in violation of
>        the First Amendment.

The First Amendment provides that "Congress shall make no law …

abridging the freedom of speech, or of the press; or the right of the people

peaceably to assemble, and to petition the Government for a redress of grievances."

U.S. Const. amend. I.  To ensure the protection of those freedoms, the Supreme

Court has developed a "overbreadth" doctrine under which "a statute is facially

invalid if it prohibits a substantial amount of protected speech."  *United States v.*

*Williams*, 553 U.S. 285, 292 (2008).  To have a criminal statute struck down under

that doctrine, a defendant must establish that the "statute's overbreadth [is]

*substantial*, not only in an absolute sense, but also relative to the statute's plainly

legitimate sweep."  *Id*. (emphasis in original).  However, the Supreme Court has

cautioned that "[i]nvalidation for overbreadth is strong medicine that is not to be

casually employed."  *Id*. at 293 (citation omitted).

The "first step in overbreadth analysis is to construe the challenged statute"

because "it is impossible to determine whether a statute reaches too far without

first knowing what the statute covers."  *Id*.  Section 231(a)(2) provides:

> Whoever transports or manufactures for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder … [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(2). That language does not target speech or assembly—the core objects of First Amendment protection. Rather, the statute prohibits the *conduct* of transporting a firearm with the knowledge or intent that it will be used unlawfully in furtherance of a civil disorder. *See United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971) (finding that § 231(a)(3)—which forbids attempting to obstruct, impede, or interfere with a law enforcement officer engaged in duties incident to a civil disorder—"has no application to speech, but applies only to violent physical acts"); *see also* Def. Br. at 44 (characterizing § 231(a)(2) as involving the "[c]riminalization of the mere 'transport' of a firearm"). Such conduct is not inherently expressive and, thus, is not protected by the First Amendment. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) ("[W]e have extended First Amendment protection only to conduct that is inherently expressive."). Accordingly, far from being overbroad, § 231(a)(2) does not implicate the First Amendment at all.

Defendant suggested to the district court that § 231(a)(2)'s *mens rea* element—*i.e.*, the requirement that the defendant know or intend the firearm will

34

be used unlawfully in furtherance of a civil disorder—allows the government to target expressive conduct.[10]  (R. 33, Motion to Dismiss Based on Overbreadth and Vagueness at PageID# 133-34.)  However, simply transporting a firearm to a civil disorder, even when done with the intent to further such disorder, does not objectively convey any particularized message which is likely to be understood by others.  *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" (citation omitted)); *United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

Moreover, even if such conduct could be construed as expressive, that would not necessarily render § 231(a)(2) overbroad.  *See Johnson*, 491 U.S. at 406 ("The government generally has a freer hand in restricting expressive conduct than

---

[10]Defendant has not reasserted this argument on appeal and, thus, the Court may deem it waived.  *See, e.g.*, *United States v. Warshak*, 631 F.3d 266, 290 n.19 (6th Cir. 2010) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal." (citation omitted)).

it has in restricting the written or spoken word."). The statute is not targeted at the expressive elements—to the extent there are any—of transporting a firearm for use in a civil disorder. *See Mechanic*, 454 F.2d at 853 ("The term 'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a)(3)."); *see also Johnson*, 491 U.S. at 406 (explaining that the government "may not … proscribe particular conduct *because* it has expressive elements" (emphasis in original)). Rather, the statute is focused on preventing a specific activity—*i.e.*, the transport of firearms with the intent that they will be used unlawfully—that is likely to lead to violence at civil disorders. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) ("[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact … are entitled to no constitutional protection."). Any incidental impact the statute may have on expressive conduct cannot be considered substantial with respect to the statue's plainly legitimate sweep. *See N.A.A.C.P. v. Clairborne Hardware Co.*, 458 U.S. 886, 916 (1982) ("Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of 'advocacy.'" (citation omitted)).

In short, Defendant has failed to show that § 231(a)(2) is constitutionally overbroad.  The statute does not on its face target speech or expressive conduct and thus does not implicate First Amendment freedoms at all.  To the extent that the statue could be used to punish conduct that might have an expressive dimension, the statute does not target the expressive aspect of such activity and, in any event, is narrowly tailored to advance the government's substantial interest in protecting the public from the violence and danger that is likely to result from the transport of firearms to a civil disorder.  Accordingly, the statute is consistent with the First Amendment.

> C.    <u>Section 231(a)(2) does not impermissibly infringe upon the Second Amendment right to bear arms.</u>

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court found that that amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."  554 U.S. 570, 635 (2008); *accord McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010) ("[T]he Second Amendment protects the right to keep and bear arms for the purpose of self-defense.").  In reaching that conclusion, however, the Court

emphasized that "the right secured by the Second Amendment is not unlimited" and that "the right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Specifically, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt upon longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*.

"Since the Supreme Court's decision in *Heller*, courts have wrestled with its text to develop a sound approach to resolving Second Amendment challenges." *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). In *Greeno*, this Court adopted a "two-pronged approach" for considering such challenges. *Id*. "Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *Id*. If the challenged statute regulates activity falling outside the scope of the Second Amendment right, "then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id*. (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2012)). However, if "the historical evidence is inconclusive or suggests

that the regulated activity is *not* categorically unprotected," then the court must

engage in a "second inquiry into the strength of the government's justification for

restricting or regulating the exercise of Second Amendment rights." *Id.* (quoting

*Ezell*, 651 F.3d at 703). Under that second prong, the law is constitutional if it

satisfies the "appropriate level of scrutiny."[11] *Id.*

As an initial matter, this Court may only review Defendant's Second

Amendment challenge to 18 U.S.C. § 231(a)(2) for plain error because Defendant

---

[11]This Court has not yet decided what level of scrutiny is appropriate in the Second Amendment context. *See Greeno*, 679 F.3d at 520 n.2 ("Since Greeno's challenge does not survive the first prong of the two-pronged approach, we need not decide the appropriate level of scrutiny to apply to post-*Heller* Second Amendment challenges under the second prong."). The Supreme Court has expressly rejected the possibility that rational basis review would apply to such challenges. *See Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Courts which have considered the issue have generally determined the appropriate level of scrutiny on a case-by-case basis following the general principle that "the rigor of this judicial review [should] depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703; *accord Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF")*, 700 F.3d 185, 205 (5th Cir. 2012); *Kachalsky v. County of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010); *United States v. Reese*, 627 F.3d 792, 801-02 (10th Cir. 2010).

failed to sufficiently develop that challenge in the district court.[12]  (R. 33, Motion to Dismiss Based on Overbreadth and Vagueness at PageID# 133 (baldly alleging that the statute "infring[es] on the right to possess firearms" as part of a First Amendment overbreadth argument).)  *See Greeno*, 679 F.3d at 516 (reviewing a Second Amendment challenge for plain error because it was insufficiently developed below).  In any event, Defendant cannot pass the first prong of the *Greeno* test because § 231(a)(2) does not prohibit conduct that is protected by the Second Amendment.

Unlike the outright handgun bans at issue in *Heller* and *McDonald*, § 231(a)(2) does not restrict an individual's right to possess a firearm for the core Second Amendment purpose of self-defense of the home.  On the contrary, the statute simply prohibits a person from transporting a firearm in commerce with the knowledge or intent that it "will be used *unlawfully* in furtherance of a civil disorder."  18 U.S.C. § 231(a)(2) (emphasis added).

It is not clear whether and to what extent the Second Amendment protects an individual's right to transport a firearm outside of his "hearth and home."

---

[12]To establish plain error, a defendant must show (1) an error (2) that was obvious or clear, (3) that affected defendant's substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

*Heller*, 554 U.S. at 635.  *Compare*, *e.g.*, *Commonwealth v. Perez*, 952 N.E.2d 441, 451 (Mass. Ct. App. 2011) ("The Second Amendment does not protect the defendant in this case because he was in possession of the firearm outside his home."), *with*, *e.g.*, *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012) ("A right to bear arms thus implies a right to carry a loaded gun outside the home.").  *See generally Hightower*, 693 F.3d at 72 n.8 (collecting cases).

However, even assuming possession of a firearm outside the home is protected, the Second Amendment does not protect an individual's right to use a firearm in an *unlawful* manner.  *See Greeno*, 679 F.3d at 520 ("[T]he right to keep and bear arms is for *lawful purposes*." (emphasis in original)); *see also Heller*, 554 U.S. at 625 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for *lawful* purposes" (emphasis added)).  Accordingly, by targeting its prohibition only to conduct which is intended to further the unlawful use of firearms, § 231(a)(2) does not intrude upon any Second Amendment rights.

Even if § 231(a)(2) can be construed as impacting Second Amendment rights, its minimal intrusion on such rights would be justified by the government's

important and weighty interest in public safety.[13]  *See Kachalsky*, 701 F.3d at 94

("[W]hile the state's ability to regulate firearms is circumscribed in the home,

'outside the home, firearm rights have always been more limited, because public

safety interests often outweigh individual interests in self-defense.'" (quoting

*Masciandaro*, 638 F.3d at 470)).  Indeed, the need for public protection during a

"civil disorder" is obvious from the statutory definition of that term: "any public

disturbance involving acts of *violence* by assemblages of three or more persons,

which causes an *immediate danger* of or results in damage or injury to the

property or person of any other individual."  18 U.S.C. § 232(1) (emphasis added).

By prohibiting individuals from transporting firearms which are intended for

unlawful use at such events, § 231(a)(2) is substantially related to the legitimate

goal of preventing violence.  As such, even if the statute impacts Second

---

[13]Because § 231(a)(2) regulates activity which falls outside the Second
Amendment's protections, the Court need not reach the second *Greeno* prong and,
thus, need not determine the appropriate level of scrutiny to apply.  However,
should the Court reach that issue, it should evaluate § 231(a)(2) under the less-
demanding "intermediate scrutiny" standard which "requires the government to
show a reasonable fit between the law and an important government objective."
*BATF*, 700 F.3d at 205.  *See Kachalsky*, 701 F.3d at 93 & n.17 (explaining that
"applying less than strict scrutiny when the regulation does not burden the 'core'
protection of self-defense in the home makes eminent sense" and citing numerous
cases applying intermediate scrutiny to such laws); *Ezell*, 651 F.3d at 708 ("[L]aws
restricting activity lying closer to the margins of the Second Amendment right,
laws that merely regulate rather than restrict, and modest burdens on the right may
be more easily justified.")

Amendment rights—it does not—the district court did not plainly err in concluding that it was constitutional.

D.    Section 231(a)(2) is not impermissibly vague.

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Williams*, 553 U.S. at 304.  This Court must "consider whether a statue is vague as applied to the particular facts at issue, for [a defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718-19 (2010) (citation omitted). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  *Williams*, 553 U.S. at 306.  "Perfect clarity and precise guidance" are not required.  *Id*. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).  Indeed, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

43

Defendant contends—mistakenly—that 18 U.S.C. § 231(a)(2) is vague in

four ways.  First, Defendant contends that the allegedly *malum prohibitum*[14] nature

of § 231(a)(2), its "obscurity," and the "lack of case law construing" the statute

mean that "an ordinary person would not be on notice that his conduct would

implicate criminal liability."  (Def. Br. at 45.)  However, that a law has been

infrequently prosecuted does not mean that it is vague, but merely that it has been

unused.  Moreover, it is well-established that a defendant is presumed to know the

law and "ignorance of the law or a mistake of law is no defense to criminal

prosecution."  *Cheek v. United States*, 498 U.S. 192, 199 (1991); *accord United

States v. Freed*, 401 U.S. 601, 612 (1971) (Brennan, J., concurring) ("If the ancient

maxim that 'ignorance of the law is no excuse' has any residual validity, it

indicates that the ordinary intent requirement—*mens rea*—of the criminal law does

not require knowledge that an act is illegal, wrong, or blameworthy.").  That

presumption applies in this case.  Section 231(a)(2) is not so "technical or obscure

that it threatens to ensnare individuals engaged in apparently innocent conduct."

*United States v. Baker*, 197 F.3d 211, 219 (6th Cir. 1999) (finding that 18 U.S.C.

§ 922(g)(8) was not unconstitutionally vague based on its obscurity and relatively

---

[14]*Malum prohibitum*, which is Latin for "prohibited evil," refers to an "act
that is a crime merely because it is prohibited by statue, although the act itself is
not necessarily immoral."  Black's Law Dictionary (9th ed. 2009).

infrequent use).  On the contrary, transporting a firearm with the intent to use it

unlawfully while conducting citizens' arrests of government officials is conduct

which the average individual would reasonably expect to be criminal.

Second, Defendant contends that "the mental requirement in

Section 231(a)(2) of 'having reason to know' is too vague."  (Def. Br. at 45.)

However, the Supreme Court has previously found that similar *mens rea*

language—"with intent or reason to believe"—is not vague.  *Gorin v. United*

*States*, 312 U.S. 19, 27-28 (1941) (upholding a provision of the Espionage Act

now incorporated as 18 U.S.C. § 793).  Likewise, other courts have found that the

very same *mens rea* language used in § 231(a)(2) is not unconstitutionally vague.

*See Featherston*, 461 F.2d at 1121 (rejecting vagueness challenge to the phrase

"knowing or having reason to know" in 18 U.S.C. § 231(a)(1)); *National*

*Mobilization Committee to End the War in Vietnam v. Foran*, 411 F.2d 934, 937

(7th Cir. 1969) (same).  Defendant does not explain how the phrase "having reason

to know," which employs common words conveying everyday concepts of

knowledge and intent renders § 231(a)(2) difficult to understand.  On the contrary,

the inclusion of a scienter—*i.e.*, knowing—requirement in a statue typically

decreases the likelihood of vagueness.  *Hill v. Colorado*, 530 U.S. 703, 720 (2000).

45

Third, Defendant contends that the word "unlawful" renders the statue vague "because it does nothing to limit the application of the statue in regard to what constitutes unlawful conduct." (Def. Br. at 46.) Again, Defendant fails to explain how the term "unlawful," which generally means contrary to law is not intelligible. In the specific context of § 231(a)(2), the word "unlawfully" simply clarifies the scope of the *mens rea* element by requiring that the defendant intend that the firearm he has transported be used in a manner contrary to law. As such, the use of that term makes it even less likely that § 231(a)(2) will be used to "trap the innocent." *Grayned*, 408 U.S. at 109. Indeed, Defendant cannot reasonably have been surprised to learn that his intended use of firearms to take over Madisonville and conduct citizens' arrests would be unlawful. *See*, *e.g.*, Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii) (prohibiting, as "aggravated assault," using or displaying a deadly weapon in connection with an assault); Tenn. Code Ann. § 39-13-304(a)(5) (prohibiting, as "aggravated kidnapping," committing false imprisonment while in possession of a deadly weapon).

To the extent Defendant is claiming that § 231(a)(2) impermissibly incorporates elements of state law into a federal offense, his argument is misplaced. The statute does not incorporate state law as an element of the offense. In any event, Congress may constitutionally enact laws that rely upon or explicitly

incorporate state law.  *See*, *e.g.*, *United States v. Sharpnack*, 355 U.S. 286, 293 (1958) (upholding the constitutionality of the Assimilative Crimes Act, 18 U.S.C. § 13, which applies state criminal law in a federal enclave).  Moreover, it is not vague for a federal law to use terms such as "illegal."  *See United States v. Leon*, 534 F.2d 667, 673 (6th Cir. 1976) (rejecting vagueness challenge to 18 U.S.C. § 1955, which prohibits operating an "illegal gambling business"), *overruled on other grounds by United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984).

Fourth, Defendant argues that the term "civil disorder" is "too vague to support criminal liability … because it would allow a person to be found criminally liable without any requirement that such person cause or associate with those who cause the 'public disturbance' referenced in the statue."  (Def. Br. at 46.)  That argument appears to misunderstand what § 231(a)(2) actually prohibits.  The statute does not criminalize participating in a civil disorder.  *See Mechanic*, 454 F.2d at 849 ("The crime set forth is not mere presence at a civil disorder.").  Rather, it prohibits transporting a firearm with the knowledge or intent that it will be used unlawfully in furtherance of a civil disorder.

An accompanying statute narrowly defines a "civil disorder" as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger or results in damage or injury to the property or

47

person of any other individual." 18 U.S.C. § 232(1). That definition is not vague, but rather uses terms that are easily understood to identify with precision the specific type of public disturbances that qualify under the statute. *See Mechanic*, 454 F.2d at 853 (rejecting vagueness challenge to definition of "civil disorder").

Finally, Defendant contends that the rule of lenity "mandates dismissal of the Superseding Indictment in this case on grounds of overbroadness and vagueness." (Def. Br. at 46.) The rule of lenity, however, only applies when a statute is ambiguous. *E.g.*, *United States v. Santos*, 553 U.S. 507, 514 (2008). Because § 231(a)(2) is not ambiguous, but rather clearly applies to Defendant's conduct in this case, the rule of lenity cannot help him. *E.g.*, *DePierre v. United States*, 131 S. Ct. 2225, 2237 (2011).

In sum, Defendant has failed to establish that 18 U.S.C. § 231(a)(2) violates the Commerce Clause, the First Amendment, the Second Amendment, or the due process guarantee of the Fifth Amendment. Accordingly, the district court's conclusion that § 231(a)(2) is constitutional should be affirmed.

## III. The district court properly concluded that the indictment was constitutionally sufficient.

This Court reviews the sufficiency of an indictment *de novo*. *United States v. Cross*, 677 F.3d 278, 283 (6th Cir. 2012). The Sixth Amendment provides that

"[i]n all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. That constitutional protection is implemented by the requirement that the indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment passes constitutional muster if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).

"It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence [*sic*] intended to be punished.'" *Id*. (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)); *accord United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007) ("[A]n indictment parroting the language of a federal criminal statute is often sufficient."). When a term used in a statute is a "legal term of art," rather than "merely a generic or descriptive term," the indictment need not allege the "legal definition" of the term. *Hamling*, 418 U.S. at 118 (finding that the term "obscenity" was a legal term of art which

need not be explicitly spelled out in the indictment).  This Court uses "a common

sense construction" to determine whether an indictment satisfies those

constitutional requirements.  *Allen v. United States*, 867 F.2d 969, 971 (6th Cir.

1989).

> Count One of the indictment charged Defendant as follows:
>
> On or about April 20, 2010, in Monroe County, in the Eastern District
> of Tennessee and elsewhere, the defendant
>
> DARREN WESLEY HUFF
>
> did transport in commerce a firearm, knowing and having reason to
> know and intending that such firearm would be used unlawfully in
> furtherance of a civil disorder.
>
> In violation of Title 18, United States Code, Section 231(a)(2).

(R. 19, Superseding Indictment at PageID# 40.)  That language tracks verbatim the

language of 18 U.S.C. § 231(a)(2) and identifies with precision the date and

location of Defendant's offense as well as the specific statute his conduct violated.

Nevertheless, Defendant contends that the indictment was deficient because

it did not contain the following information: (1) facts establishing that a "public

disturbance"—an element of the definition of civil disorder in 18 U.S.C.

§ 232(1)—occurred; (2) facts demonstrating how the firearm was transported in

commerce; (3) facts describing how the transportation of the firearm substantially

affected interstate commerce; (4) facts describing how Defendant had the requisite intent to violate § 231(a)(2); (5) facts explaining how the transportation of the firearm would be unlawful; and (6) facts identifying the specific firearm that was transported. (Def. Br. at 50-51.) However, the indictment was not constitutionally required to contain such information. Accordingly, Defendant's argument is meritless.

The first category of information which Defendant alleges the indictment should have contained is facts relating to the statutory terms "civil disorder" and "firearm." (Def. Br. at 50-51 (items 1 & 6).) However, both of those terms are legal terms of art, like the term "obscene" in *Hamling*, and thus had "sufficiently definite … legal meaning to give [D]efendant notice of the charge against him." *Hamling*, 418 U.S. at 118. *See* 18 U.S.C. 232 (defining the terms "civil disorder" and "firearm"). Moreover, it is well-established that the specific type of firearm used is not an element of a crime which prohibits possession or transportation of a firearm. *E.g.*, *United States v. Vincent*, 20 F.3d 229, 236 (6th Cir. 1994); *see also United States v. Davis*, 306 F.3d 398, 411 (6th Cir. 2000) (explaining that an indictment need only allege the specific type of firearm if that type of firearm enhances the statutory punishment for the offense).

Second, Defendant alleges that the indictment should have set forth facts detailing the jurisdictional basis for the offense.  (Def. Br. at 50-51 (items 2 & 3).)  However, "[a]n indictment that alleges the interstate commerce element of a federal offense in conclusory terms, without setting forth evidentiary detail, is not insufficient."  *United States v. Williams*, 679 F.2d 504, 509 (5th Cir. 1982); *accord United States v. Hill*, 386 F.3d 855, 859 (8th Cir. 2004) ("We fail to see how an indictment under § 922(g)(1) that tracks the statutory element [of 'in or affecting interstate commerce'] is defective."); *United States v. Williams*, 545 F.2d 1036, 1039 (6th Cir. 1976) (holding that an indictment which charged defendant with possessing chattels that were part of an interstate shipment of freight was not defective merely because it did not enumerate the statutory facilities or instrumentalities of such commerce); *see generally* 1 Charles Alan Wright et al., Federal Practice and Procedure § 125 (4th ed. 2008) ("Specific factual claims about how the nexus to interstate commerce was affected often are not required.").

Next, Defendant alleges that the indictment should have set forth facts "to establish the reason that the alleged transportation of the … firearm would be unlawful." (Def. Br. at 51 (item 5).)  Yet the reason Defendant's transportation of the firearm was unlawful was because it was in violation of 18 U.S.C. § 231(a)(2)—a fact clearly specified in the indictment.  *See*, *e.g.*, *United States v.*

52

*Smith*, 552 F.2d 257, 261 (8th Cir. 1977) ("Failure to charge that he also acted 'unlawfully' is not fatal to the indictment; the allegation that he violated federal law was sufficient notice that he acted unlawfully.").

Finally, Defendant alleges that the indictment should have included facts to demonstrate that he had the requisite *mens rea* for the offense. (Def. Br. at 51 (item 4).). However, the indictment alleged Defendant's *mens rea* using the precise language of the statute—"knowing and having reason to know and intending." (R. 19, Superseding Indictment at PageID# 40.) *Compare* 18 U.S.C. § 231(a)(2) ("knowing or having reason to know or intending"). More is not required. *See*, *e.g.*, 1 Charles Alan Wright et al., Federal Practice and Procedure § 125 (4th ed. 2008) ("[A]n indictment may be found sufficient if the pleading fairly imports the required *mens rea*.").

In sum, Defendant has failed to establish that his indictment was constitutionally deficient. Rather, a common-sense construction of the indictment reveals that it notified Defendant of the charges he faced, fully listed the elements of those charges, and enabled him to protect himself from any subsequent prosecution for the same offense.

**IV.    The government presented sufficient evidence for any rational juror to conclude that Defendant violated 18 U.S.C. § 231(a)(2).**

Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  A reviewing court is "bound to make all reasonable inferences and credibility choices in support of the jury's verdict," *United States v. Newsom*, 452 F.3d 593, 608 (6th Cir. 2006), and must "refrain from independently judging the weight of the evidence." *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001); *accord United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (reviewing court does not reweigh evidence, reevaluate the credibility of witnesses, or substitute its judgment for that of the jury).  A defendant challenging the sufficiency of the evidence for his conviction "bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006).

To establish a violation of 18 U.S.C. § 231(a)(2), the United States was required to prove that Defendant (1) transported a firearm in commerce, and (2) did so knowing, having reason to know, or intending that the firearm would be used unlawfully in furtherance of a civil disorder.  18 U.S.C. § 231(a)(2).  The

54

term "civil disorder" means "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or result in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).  Defendant challenges the United States's proof only with respect to the second element.  (Def. Br. at 52-55.)  That challenge lacks merit.

Bank employees Longmire and Dupree testified that, on April 15, 2010, Defendant told them that he and other members of the Georgia Militia were going to "take over" Madisonville, Tennessee, on April 20, 2010.  (R. 210, Trial Tr. at PageID# 1472; *accord* R. 209, Trial Tr. at PageID# 1447-50.)  Defendant explained that the group would have guns and specifically noted that he was going to take two AK-47 rifles with him and planned to mount at least one gun on the back of his truck.  (R. 209, Trial Tr. at PageID# 1449-50; R. 210, Trial Tr. at PageID# 1471-1473.)  Longmire and Dupree did not view Defendant's statements as a joke or mere bluster, but rather were so concerned that they each independently contacted law enforcement officials.  (R. 209, Trial Tr. at PageID# 1452-53; R. 210, Trial Tr. at PageID# 1475-1478.)

Despite that clear evidence of Defendant's intent to use firearms in a public disturbance involving planned acts of violence that were likely to cause immediate danger to others, Defendant contends that his statements to Special Agent Reed on

55

April 19, 2010, "belie" any such intent.  (Def. Br. at 54.)  However, Defendant's statements to Special Agent Reed were consistent with the statements he made to Longmire and Dupree and, if anything, provided even further evidence of his intent to use firearms in furtherance of a civil disorder.  Defendant confirmed that he and other members of the Georgia Militia were planning to go to Madisonville "to try to take back [the city] and possibly … take back Monroe County, then possibly the State of Tennessee and the United States."  (R. 210, Trial Tr. at PageID# 1672.)  Defendant explained that they were planning to conduct citizens' arrests in connection with the Fitzpatrick case.  (*Id*. at PageID# 1678, 1673.)  Defendant stated that "he would be armed with his Colt .45 handgun and he would have his AK-47 with him."  (*Id*.)

While Defendant did say that they "would not resort to violence," he qualified that statement with the following condition: "unless they were provoked."  (*Id*. at PageID# 1673.)  Defendant also repeatedly referred to situation as being "us against them" where the "us" was himself and the other Georgia Militia members and the "them" was the government and law enforcement officials in Madisonville.  (*Id*. at PageID# 1672-73.)

Defendant emphasizes that he voluntarily talked to Special Agent Reed and told him to call Defendant if there was a problem.  (Def. Br. at 53.)  However, the

56

jury could reasonably infer that those comments were designed primarily to prevent any government interference with Defendant's planned conduct. Moreover, Defendant's other statements clearly indicated that he had not wavered in his intent to travel to Madisonville with multiple firearms for the purpose of conducting citizens' arrests and taking over the city. Thus, the jury could have, and did, reasonably conclude that Defendant had the requisite *mens rea* for his § 231(a) violation.

Defendant next contends that his "voluntary relinquishment of his handgun" during the traffic stop on his way to Madisonville is "inconsistent" with the jury's conclusion that he had the requisite intent. (Def. Br. at 54.) Contrary to Defendant's contention, he did not "relinquish" his handgun. Although he placed the Colt .45 caliber handgun in the tool box of his truck at the officers' request, Defendant still maintained possession of that firearm and an AK-47 rifle as he proceeded to Madisonville. (R. 210, Trial Tr. at PageID# 1514, 1563.) Indeed, a law enforcement officer testified that he observed Defendant retrieve the handgun from the toolbox after he arrived in Madisonville. (*Id*. at PageID# 1572, 1582-83.)

Moreover, Defendant's statements during the traffic stop revealed that he had not abandoned his intent to use firearms unlawfully in furtherance of a civil disorder. Defendant "pre-warn[ed]" the officers that he and others were "going to

57

proceed forward in this citizen's arrest." (*Id*. at PageID# 1504.) Defendant explained, "that's why … I have my .45. Ain't no government official going peacefully." (*Id*. at PageID# 1505.) He also stated that "he had an AK-47 and two to 300 hundred rounds in the toolbox of his vehicle and he had the right to take this out to protect himself and effect these arrests." (*Id*. at PageID# 1555.) He warned the officers that "[i]f it comes to that, I've got to fight you guys, I have no choice." (Gov't Trial Ex. 40.) Rather than being inconsistent with the jury's verdict, those statements fully support it.

Even if Defendant's mere act of placing his Colt .45 handgun in the tool box during the traffic stop could be construed as revealing a change of mind—it cannot—that would not help Defendant. Defendant's offense was complete the moment he crossed the Georgia-Tennessee border transporting a firearm with the intent that it be used in furtherance of a civil disorder. *See*, *e.g.*, *United States v. Wise*, 278 F. App'x 552, 564 (6th Cir. 2008) (explaining that the offense of transporting a minor with the intent that the minor engage in sexual activity, in violation of 18 U.S.C. § 2423(a), is "complete once the defendant … transports the victim across state lines with the requisite purpose or intent").

Finally, the fact that Defendant brought Desilva with him to Madisonville and the fact that Desilva claimed that he never saw Defendant with a firearm does

not negate the other overwhelming evidence of Defendant's intent.  (*See* Def. Br. at 54-55.)  Witnesses testified that Defendant was met in Madisonville with an overwhelming law enforcement presence of close to one hundred officers.  (R. 210, Trial Tr. at PageID# 1602; R. 212, Trial Tr. at PageID# 1968.)  Defendant was also overheard telling a member of his group that it would be a good day to take over the courthouse but that they needed more people.  (R. 210, Trial Tr. at PageID# 1608.)  That Defendant backed off and changed his plan in response to a strong law enforcement presence in Madisonville does not mean he did not have the requisite intent to use firearms in furtherance of a civil disorder when he traveled there that morning.

In sum, testimony from multiple witnesses at trial provided a solid basis for any rational juror to conclude that Defendant intended to use the firearms he transported to Madisonville in furtherance of a civil disorder.  Defendant's conviction should be affirmed.

## V.    Defendant's below-Guidelines sentence is procedurally and substantively reasonable.

This Court reviews criminal sentences for procedural and substantive reasonableness under "a deferential abuse of discretion standard."  *Gall v. United States*, 552 U.S. 38, 41 (2007).  Under the procedural prong of that analysis, the

Court must "first ensure that the district court committed no significant procedural error," *e.g.*, by failing to properly calculate the Guidelines range, treating the range as mandatory, failing to consider the 18 U.S.C. § 3553(a) sentencing factors, selecting the sentence based upon clearly erroneous facts, or by failing to adequately explain the chosen sentence. *Id*. at 51.

After finding that a sentence is procedurally sound, the Court "must assess the substantive reasonableness of the sentence in light of the totality of the circumstances, giving 'due deference' to the sentencing judge, in recognition of his greater familiarity with the case, his superior position to find facts and assess credibility, and the institutional advantage that comes with frequent sentencing of offenders." *United States v. Houston*, 529 F.3d 743, 755 (6th Cir. 2008) (citing and quoting *Gall*, 552 U.S. at 51-52). "The defendant shoulders the burden of showing substantive unreasonableness." *United States v. Woodard*, 638 F.3d 506, 510 (6th Cir. 2011). To be substantively reasonable, the length of the sentence "must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (internal quotations omitted).

The district court's determination on this point is entitled to deference; "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51; *accord United States v. Overmeyer*, 663 F.3d 862, 864 (6th Cir. 2011) ("[I]t is trial judges, not appellate judges, who have considerable discretion in applying the § 3553(a) factors to an individual."). In addition, a sentence within or below the properly calculated Guidelines range is afforded a rebuttable presumption of reasonableness. *E.g.*, *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (*en banc*). Rebutting that presumption is "no small burden" and this Court "will not generally 'second guess' sentences on substantive grounds when they fall in the range prescribed by the Guidelines." *United States v. Simmons*, 587 F.3d 348, 365 (6th Cir. 2009) (citation omitted).

Defendant contends that his sentence is procedurally unreasonable because the district court allegedly erred by using § 2A2.2 as the most analogous offense guideline for his violation of 18 U.S.C. § 231(a)(2). (Def. Br. at 56-58.) He further argues that his forty-eight-month, below-Guidelines sentence is substantively unreasonable. (Def. Br. at 60-63.) Neither argument has merit.

61

A.    The district court properly applied an U.S.S.G. § 2K2.1(c) cross-reference to § 2A2.2.

Defendant claims that the district court erred by concluding that U.S.S.G. § 2A2.2 was the most analogous offense guideline for 18 U.S.C. § 231(a)(2) and contends that the district court should have applied § "2K2.1(a)(7)" instead. (Def. Br. at 56-57.)  However, the record reflects that the district court did apply § 2K2.1 as the most analogous guideline, then arrived at § 2A2.2 by applying the cross-reference provision—subsection (c)(1)—of § 2K2.1.  (R. 197, Memorandum Opinion and Order at PageID# 1248-61.)  Accordingly, rather than disputing the district court's selection of the most analogous guideline under § 2X5.1, Defendant is really challenging the district court's application of the § 2K2.1(c)(1) cross-reference.  This Court reviews that mixed question of law and fact *de novo*.  *United States v. Grimes*, 348 F. App'x 138, 141 (6th Cir. 2009) (citing *United States v. Brika*, 487 F.3d 450, 454 (6th Cir. 2007)).

Section 2K2.1(c)(1) provides in relevant part:

If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, apply … § 2X1.1[15] (Attempt, Solicitation, or

---

[15]Section 2X1.1, in turn, directs a court to apply "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such

> Conspiracy) in respect to that other offense, if the resulting offense
> level is greater than that determined above.

U.S.S.G. § 2K2.1(c)(1)(A).  The commentary specifies that the cross-reference should "apply if the firearm or ammunition facilitated, or had the potential of facilitating … another offense."  *Id.*, cmt. (n.14(A)).  The commentary also specifies that "another offense" means "any Federal, state, or local offense, other than the … firearms possession … offense, regardless of whether a criminal charge was brought, or a conviction obtained."  *Id.*, cmt. (n.14(C)).

Here, the district court properly determined that a preponderance of the evidence established that Defendant possessed a firearm with the intent that it would be used in connection with an aggravated assault in Madisonville.  A person commits an aggravated assault under Tennessee law if he "commits an assault … and … uses or displays a deadly weapon."  Tenn. Code. Ann. § 39-13-102(a)(1)(A)(ii).  The statutes define assault as "(1) [i]ntentionally, knowingly or recklessly caus[ing] bodily injury to another; (2) [i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly cause[ing] physical contact with another [if] a reasonable person

---

guideline for any intended offense conduct that can be established with reasonable certainty."  U.S.S.G. § 2X1.1(a).

would regard the contact as extremely offensive or provocative." Tenn. Code.

Ann. § 39-13-101.

Trial testimony established that Defendant intended to use firearms to

unlawfully execute citizens' arrest warrants on several Madisonville officials.

(*E.g.*, R. 210, Trial Tr. at PageID# 1505, 1532-33, 1553-55.)  Given that evidence,

the district court did not err in concluding that "had the defendant been able to

carry out [his] plan … he would have either caused others to reasonably fear

imminent bodily injury or caused physical contact that a reasonable person would

have found extremely offensive or provocative."  (R. 197, Memorandum Opinion

and Order at PageID# 1261.)  Accordingly, the district court properly applied the

§ 2K2.1(c) cross-reference to § 2A2.2 here.

  B. <u>Defendant has not rebutted the presumption that his below-Guidelines</u>
    <u>sentence is substantively reasonable.</u>

Defendant contends that his below-Guidelines sentence is substantively

unreasonable because he allegedly was simply exercising his Second Amendment

rights and because he is allegedly not "one of the 'worst of the worst.'" (Def. Br. at

60-63.)  However, the district court considered and rejected those arguments

below.  (R. 216, Sentencing Tr. at PageID# 2190-2201.)  Defendant's mere

disagreement with the district court's sentencing determination is "insufficient to

justify … disturbing the reasoned judgment of the district court." *United States v. Trejo-Martinez*, 481 F.3d 409, 413-14 (6th Cir. 2007); *accord United States v. Ward*, 506 F.3d 468, 478 (6th Cir. 2007) (finding no basis for resentencing in argument that the district court improperly weighed the statutory sentencing factors by not adopting defendant's position at sentencing).

Moreover, contrary to Defendant's contention, he is not "being punished with prison time because he chose to exercise his rights under the Second Amendment." (Def. Br. at 62.) While Defendant had a right to possess firearms for self-defense, he had no right to transport those firearms with the intent to use them unlawfully in furtherance of a civil disorder. Such conduct presented a clear danger to the citizens and law enforcement authorities in Madisonville. As such it merited a sentence of at least forty-eight months' imprisonment. Defendant's sentence is not unreasonable.

# CONCLUSION

For the foregoing reasons, Defendant's conviction and sentence should be affirmed.

Respectfully submitted,

William C. Killian
United States Attorney


 *s/Luke A. McLaurin*
Luke A. McLaurin
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902
(865) 545-4167


 *s/Jeffrey E. Theodore*
Jeffrey E. Theodore
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902
(865) 545-4167

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Rule

32(a)(7)(B) of the Federal Rules of Appellate Procedure, in that it contains 13,951

words, excluding the cover, table of contents, table of authorities, statement

regarding oral argument, the certificates of counsel, and the designation of relevant

district court documents.  This certification is based upon the word count of the

word-processing program used to generate the brief, Word Perfect X4.

       *s/ Luke A. McLaurin*
       Luke A. McLaurin
       Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that, on the July 17, 2013, the foregoing Sixth Circuit Brief was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Opposing counsel may access this filing through the Court's electronic filing system.  Anyone not named as being served electronically will be served by regular United States Mail, postage prepaid.

*s/ Luke A. McLaurin*
Luke A. McLaurin
Assistant United States Attorney

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL from the |
| v. | ) | United States District Court |
| | ) | for the Eastern District |
| DARREN WESLEY HUFF, | ) | of Tennessee |
| Defendant-Appellant. | ) | No. 3:10-CR-73 |

| Entry No. | Description of Entry | PageID# |
|---|---|---|
| R. 19 | Superseding Indictment | 40-41 |
| R. 22 | Motion to Suppress | 47-51 |
| R. 23 | Motion for Bill of Particulars | 52-56 |
| R. 29 | Motion to Dismiss for Failure to Establish Commerce Clause Jurisdiction | 67-81 |
| R. 32 | Motion to Dismiss Insufficient Indictment | 118-128 |
| R. 33 | Motion to Dismiss Based on Overbreadth and Vagueness | 129-143 |
| R. 35 | Second Motion for a Bill of Particulars | 155-157 |
| R. 48 | Suppression Exhibit and Witness List | 231 |
| R. 55 | Suppression Hearing Transcript | 264-391 |
| R. 62 | Report and Recommendation | 446-463 |
| R. 64 | Report and Recommendation | 470-479 |
| R. 68 | Report and Recommendation | 510-524 |
| R. 76 | Report and Recommendation | 609-643 |
| R. 80 | Memorandum and Order | 649-656 |
| R. 83 | Memorandum and Order | 662-672 |

| Entry No. | Description of Entry | PageID# |
|:---:|:---|:---:|
| R. 84 | Memorandum and Order | 673-688 |
| R. 101 | Memorandum and Order | 800-810 |
| R. 106 | Memorandum and Order | 828-836 |
| R. 114 | Bill of Particulars | 854-855 |
| R. 140-1 | Citizens' Arrest Warrant | 969 |
| R. 140-2 | Affidavit of Criminal Complaint | 970 |
| R. 167 | Jury Verdict | 1054 |
| R. 168 | Trial Exhibit and Witness List | 1055-1057 |
| R. 189 | Sentencing Memorandum | N/A |
| R. 191 | Memorandum Regarding Application of Guidelines | 1217-1229 |
| R. 192 | Motion for Upward Departure | 1230-1233 |
| R. 197 | Memorandum Opinion and Order | 1248-1270 |
| R. 203 | Judgment | 1325-1330 |
| R. 204 | Notice of Appeal | 1331-1332 |
| R. 209 | Trial Transcript, 10/18/12 | 1391-1464 |
| R. 210 | Trial Transcript, 10/19/12 | 1465-1703 |
| R. 211 | Trial Transcript, 10/20/12 | 1704-1889 |
| R. 212 | Trial Transcript, 10/21/12 | 1890-1996 |
| R. 213 | Sentencing Transcript, 4/20/12 | 1997-2053 |
| R. 216 | Sentencing Transcript, 5/15/12 | 2103-2209 |

 *s/Luke A. McLaurin*
Luke A. McLaurin
Assistant United States Attorney